UNITED STATES of America,
Appellant,

v.

William GENAO, also known
as William Genao Frias,
Defendant–Appellee.

Docket No. 02–1239.

United States Court of Appeals,
Second Circuit.

Argued: March 14, 2003.

Decided: Sept. 9, 2003.

Amended: Sept. 10, 2003.

Peter G. Neiman (Celeste L. Koeleveld and Meir Feder, Assistant United States Attorneys, of counsel; James B. Comey, United States Attorney for the Southern District of New York, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellant.

Ivan S. Fisher, New York, NY, for Defendant–Appellee.

Before: OAKES, McLAUGHLIN and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

The Government appeals from a judgment of conviction against William Genao, entered March 21, 2002 in the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge*). Following a guilty plea, Genao stood convicted of one count of making false statements to representatives of the United States Attorney's Office and the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001,[1] and was sentenced by the District Court principally to six months of imprisonment. On appeal, the Government argues that the District Court erred in calculating Genao's sentence when it (1) declined to invoke the cross-reference provision of U.S.S.G. § 2B1.1(c)(3); and (2) concluded that it lacked discretion to upwardly depart pursuant to Application Note 15 to U.S.S.G. § 2B1.1 for Genao's aggravating, non-monetary objective of obstructing a criminal investigation. We agree with the District Court that the cross-reference provision of § 2B1.1(c)(3) was not applicable, but hold, contrary to the view of the District Court, that defendant's aggravating, non-monetary objective did permit upward departure pursuant to Application Note 15.

### BACKGROUND

Genao operated W.G. International, a company located in the Dominican Republic that converts currency from United States dollars to Dominican pesos. Genao and W.G. International became involved in a conspiracy that laundered over $65 million between 1995 and 1997. The conspirators used proceeds from narcotic sales to purchase food stamps on the black market in the United States, deposited the food stamps into bank accounts in the names of small grocery stores controlled by the conspirators, and received credit for the full face value of the food stamps.

The principal participants in the money laundering conspiracy were Amelfis Her-

---

**1.** 18 U.S.C. § 1001(a)(2) provides in relevant part:

    (a) ... whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

    ...

    (2) makes any materially false, fictitious, or fraudulent statement or representation; ...

    ...

shall be fined under this title or imprisoned not more than 5 years, or both.

nandez and Reynaldo Cespedes. Hernandez operated a travel agency in Manhattan. She received cash proceeds from drug dealers and then arranged for the money to be transferred to the Dominican Republic through Genao's company or his bank accounts in Miami. Cespedes controlled a number of small grocery stores in New York. He received narcotics proceeds from Hernandez, purchased food stamps on the black market with this money, and deposited the food stamps into his grocery stores' bank accounts. Cespedes then wrote checks from the grocery store accounts to companies controlled by Genao and delivered the checks to Hernandez, who, in turn, delivered them to W.G. International or directly to Genao's Miami accounts. In this manner, millions of dollars were deposited into bank accounts in Miami controlled by Genao or W.G. International. Genao then exchanged the U.S. dollars in his Miami bank accounts for pesos from Dominican "businesses" that needed United States dollars to purchase goods for import into the Dominican Republic. Most of the "businesses" in the Dominican Republic that received the United States dollars were in fact representatives of the drug traffickers.

In August 1998, the Government executed a seizure warrant and froze Genao's accounts in Miami. On August 25, 1998 Genao met with representatives of the United States Attorney's Office and the FBI in New York, seeking the return of the frozen funds. Genao described W.G. International as a currency exchange business that acquired United States dollars from various sources and sold them at a profit in the Dominican Republic. Genao acknowledged that he had received funds from Cespedes but denied knowing that Cespedes was receiving those funds from Hernandez or that the funds were narcotics proceeds. Genao said that his employee, Alexander Sued, managed W.G. International and was the only person who dealt with Cespedes.

Genao was arrested during the August 25, 1998 meeting on a complaint charging him with conspiring to launder money in violation of 18 U.S.C. § 1956(h). The complaint was based primarily on information provided by Cespedes, who had already been arrested and had begun cooperating with the Government prior to Genao's meetings with the federal investigators. Genao continued the interview subsequent to his arrest and admitted to knowing that the checks Cespedes deposited into his accounts were not legitimate business proceeds but, rather, were covered by cash that Cespedes had received from Hernandez. Genao claimed that he did not become aware of the arrangement between Cespedes and Hernandez until his employee Sued informed him of it at the end of 1996 or at the beginning of 1997—long after the checks had been deposited into his accounts. He also claimed that he told Sued to stop accepting transactions from Cespedes or Hernandez as soon as he became aware of their arrangement.

Following his August 25, 1998 meeting, Genao complied with the Government's request to provide it with certain documents from W.G. International. These documents showed that in 1996 and 1997 W.G. International continued to accept transactions from Cespedes and Hernandez totaling more than $4 million. Genao then requested the opportunity to make an "innocence proffer," *i.e.*, to have a meeting with the Government in the hopes of demonstrating that he had been unaware of any criminal taint to the money he received from Cespedes and Hernandez. Genao agreed to waive his right to a speedy trial, thereby permitting the Government to postpone the filing of an indictment until after Genao's innocence proffer.

In October and November of 1998, Genao met with FBI investigators and Assis-

tant United States Attorneys on three separate occasions. Unable to reconcile the discrepancies between Genao and Cespedes' accounts, the Government dismissed the money laundering complaint against Genao in December 1998.

In early January 1999, Hernandez began cooperating with the Government. She corroborated Cespedes' account, stating that Genao introduced her to Cespedes in 1995 and that he arranged for her to deliver cash to Cespedes, to receive checks in return, and to send the checks to W.G. International in the Dominican Republic.

In January 1999, the Government convened a grand jury, which returned a four-count indictment charging Genao with, *inter alia*, lying to the Government during his interviews and his innocence proffers, in violation of 18 U.S.C. § 1001. On May 16, 2000 Genao pleaded guilty to Count Four of the indictment, which charged him with violating § 1001 by falsely claiming during the November 1998 innocence proffer that he did not learn until mid–1996 that the checks drawn on Cespedes' accounts were funded with cash Cespedes received from Hernandez. Genao's written plea agreement contained no stipulations regarding his sentence or the application of the Guidelines.

Prior to Genao' sentencing, the Government argued to the District Court that

U.S.S.G. § 2B1.1(c)(3), a cross-reference provision, permitted the Court to sentence Genao under U.S.S.G. § 2J1.2(c)(1),[2] the obstruction-of-justice guideline, rather than under U.S.S.G. § 2B1.1, the fraud guideline that generally applies to violations of 18 U.S.C. § 1001. Subsection 2B1.1(c)(3) states:

> If ... the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

U.S.S.G. § 2B1.1(c)(3) (2001). The Government maintained that the obstruction-of-justice guideline was more appropriate than the fraud guideline and that Genao's conduct violated two obstruction of justice statutes, 18 U.S.C. § 1503 and § 1512.[3] Genao objected to the application of the obstruction-of-justice guideline pursuant to the cross-reference provision of § 2B1.1(c)(3), arguing that his false statements in the innocence proffer did not constitute a violation of either § 1503 or § 1512.

In addition, the Government sought an upward departure pursuant to Application

---

**2.** U.S.S.G. § 2J1.2(c)(1) provides:

If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

**3.** 18 U.S.C. § 1503 applies to anyone that corruptly ... endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice[.]

18 U.S.C. § 1503(a).

18 U.S.C. § 1512 states in relevant part:
(b) Whoever knowingly... engages in misleading conduct toward another person, with intent to—

...

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense ...

shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3).

Note 15 to § 2B1.1, which states that an upward departure may be appropriate where "a primary objective of the offense was an aggravating, non-monetary objective."[4]

In order to resolve these issues, the District Court held an evidentiary hearing. It heard testimony from a number of witnesses, including Genao, Hernandez and Cespedes. On March 18, 2002, the District Court held a sentencing hearing. The Court concluded that Genao's testimony at the evidentiary hearing was not credible and that the Government had proved by clear and convincing evidence that Genao conspired to launder money, that he lied in various proffers in "an effort to direct the money laundering investigation away from him," and that his lying "led to the improper termination of the criminal investigation." Sentencing Tr., March 18, 2002, at 54–55.

The Court sentenced Genao under the 2001 Sentencing Guidelines, the version of the Guidelines in effect at the time of Genao's sentencing. See 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a) (2002); United States v. Gonzalez, 281 F.3d 38, 45 (2d Cir.2002). First, the District Court determined that the cross-reference provision of § 2B1.1(c)(3) could only apply if Genao's conduct constituted the crime of obstruction of justice, as defined in either 18 U.S.C. § 1503 or § 1512. The Court reasoned that, in order to constitute an obstruction of justice under § 1503, a defendant's false statements must be repeated in and obstruct a grand jury or other judicial proceeding. It con-cluded that, because no grand jury was convened in this case, Genao's conduct did not violate 18 U.S.C. § 1503. The Court also determined, without explanation, that Genao's conduct did not violate § 1512. Accordingly, the Court declined to apply the cross-reference provision of § 2B1.1(c)(3).

Second, the District Court addressed the Government's argument that it should upwardly depart pursuant to Application Note 15 to § 2B1.1, which permits an upward departure where a defendant's aggravating, non-monetary objective is not sufficiently reflected in the sentence he would otherwise receive. The Court initially stated its intent to depart upward in order to reflect the defendant's aggravating, non-monetary objective of interfering with the investigation into his participation in the money laundering scheme. However, after concluding that it could not depart pursuant to the cross-reference provision of § 2B1.1(c)(3), the Court also withdrew its prior decision to depart pursuant to Application Note 15 to § 2B1.1. It reasoned that a departure based on Application Note 15 would effectively be "a back door to allowing an upward departure" that is not permitted under § 2B1.1(c)(3).

Applying the fraud guideline generally applicable to violations of 18 U.S.C. § 1001, the Court determined that Genao's offense level was six, deducted two points for his acceptance of responsibility, and sentenced him principally to six months of imprisonment—the upper limit of the applicable guideline range.[5]

This timely appeal followed.

4. Application Note 15 to U.S.S.G. § 2B1.1 states in relevant part that an upward departure may be imposed where "the offense level determined under this guideline substantially understates the seriousness of the offense." One factor a court may consider in determining whether the seriousness of the offense has been understated is whether "[a] primary ob-jective of the offense was an aggravating, non-monetary objective." U.S.S.G. § 2B1.1, n. 15(A)(i) (2001).

5. In order to determine which version of the Guidelines to apply and to create a clear record on appeal, the District Court also cal-culated Genao's sentence under the 1998 ver-

DISCUSSION

On appeal, the Government argues that the District Court erred by: (1) declining to sentence Genao under the obstruction-of-justice guideline; and (2) concluding that it was prohibited from departing upward to reflect Genao's aggravating, non-monetary objective of interfering with the investigation into his money laundering scheme and preventing his arrest and prosecution.

## I. Standard of Review

■ Where a sentencing court's application of the Guidelines presents a question of law, our review is *de novo*. *See, e.g., United States v. Matthews*, 205 F.3d 544, 545 (2d Cir.2000). However, we review the District Court's factual determinations for clear error. *Id.*

## II. Interpretation of § 2B1.1(c)(3)

The Government first argues on appeal that the District Court erred by declining to sentence Genao under the obstruction-of-justice guideline. In particular, the Government maintains that the District Court was authorized by the cross-refer-

ence provision of § 2B1.1(c)(3) to apply the obstruction-of-justice guideline even if Genao's conduct, as set forth in the indictment, does not establish the exact elements of an obstruction-of-justice offense.

■ The cross-reference provision of § 2B1.1(c)(3) applies only if "the conduct set forth in the count of conviction establishes an offense *specifically covered* by another guideline in Chapter Two (Offense Conduct)." U.S.S.G. § 2B1.1(c)(3) (2002) (emphasis added).[6] Thus, the plain language of § 2B1.1(c)(3) indicates that § 2B1.1(c)(3) is applicable only if the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense. This interpretation of § 2B1.1(c)(3) is bolstered by the fact that § 2B1.1 replaces a previous Guideline, U.S.S.G. § 2F1.1, that contained substantially broader language: The prior guideline provided for cross-reference whenever "the indictment or information setting forth the count of conviction (or a stipulation described in § 1B1.2(a)) establishes an offense *more aptly covered* by another guideline." U.S.S.G. § 2F1.1 (deleted), cmt., n. 14 (1998) (emphasis added).[7] In *United*

---

sion of the Guidelines, which was in effect at the time of Genao's offense. *See* U.S.S.G. § 1B1.11(b)(1) (2002) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."). The District Court determined that Genao would have been sentenced to thirty-seven months of imprisonment under the 1998 version of the Guidelines, but only to six months of imprisonment under the 2001 version. Accordingly, no *ex post facto* problem existed, and the Court sentenced Genao under the 2001 Guidelines.

6. Of course, in order for a sentencing court to apply the cross-reference provision of § 2B1.1(c)(3), the conduct establishing the alternate offense must not only be set forth in the indictment, but must also have been es-

tablished by at least a preponderance of the evidence. *See, e.g., United States v. Gigante*, 94 F.3d 53, 56 (2d Cir.1996) (holding that, while the preponderance of the evidence standard constitutes the *"threshold* basis for adjustments and departures, ... the [c]ourt may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate") (emphasis added)); *see also Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

7. Section 1B1.2(a) stated in relevant part:
   [I]n the case of a plea agreement ... containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two most applicable to the stipulated offense.

*States v. Napoli,* 54 F.3d 63 (2d Cir.1995), we held that the prior cross-reference provision could be applied whenever: (1) the indictment or information alleges facts sufficient to establish a more serious crime; (2) the facts known to the sentencing court are sufficient to "establish[ ] an offense more aptly covered by another guideline[;]" or (3) the conduct "lie[s] well beyond the 'heartland' embodied in the fraud guideline." *Id.* at 66–67. Thus, we held under the prior cross-reference provision that an offense could be "more aptly covered" by another guideline "even when the elements of [another] offense cannot be established." *Id.* at 67.

Following our decision in *Napoli,* the Sentencing Commission replaced the prior cross-reference provision with § 2B1.1(c)(3), and, in doing so, limited its applicability to situations in which the conduct set forth in the count of conviction establishes an offense "specifically covered" by another guideline. This change limits the applicability of the cross-reference provision to situations in which the conduct set forth in the relevant count of the indictment actually constitutes an offense covered by another guideline. Accordingly, we hold that § 2B1.1(c)(3) is applicable only if the elements of another offense are established by conduct set

forth in the count of conviction (and proven by at least a preponderance of the evidence).[8]

### III.  *Interpretation of § 2B1.1(c)(3)*

After concluding that the elements of an obstruction of justice offense must be established by conduct set forth in the count of conviction (and proven by at least a preponderance of the evidence) in order for the court to depart upwardly pursuant to § 2B1.1(c)(3), we now turn to the issue of whether Count Four of the indictment— to which Genao pleaded guilty—presented facts sufficient to establish a violation of either 18 U.S.C. § 1503 or § 1512.

■ Section 1503, entitled "[i]nfluencing or injuring officer or juror generally," is violated whenever an individual

> corruptly ... endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice.

18 U.S.C. § 1503.

■ In *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), the Supreme Court interpreted § 1503. The Court held that, in order to

U.S.S.G. § 1B1.2(a) (1998). Accordingly, under the prior cross-reference provision, a sentencing court could take account of conduct that was not set forth in the indictment if the defendant stipulated to it as part of a plea agreement. Because the parenthetical phrase incorporating § 1B1.2(a) was removed when the cross-reference provision was transferred to § 2B1.1(c)(3), a sentencing court may no longer consider conduct set forth in a stipulation (but not in the indictment) in determining whether the cross-reference provision applies.

**8.** Application Note 11 to § 2B1.1 still uses the "more aptly covered" language of the prior cross-reference provision. *See* U.S.S.G. § 2B1.1(c)(3) n. 11 (2002) (stating that "[s]ub-

section (c)(3) provides a cross reference to another guideline" whenever "the count of conviction establishes an offense *more aptly covered* by another guideline." (emphasis added)). Where, as here, a tension exists between a guideline and its commentary "[w]e construe the guideline and its commentary together and seek to harmonize them[,]" but "[i]f a harmonizing interpretation is [not] possible ... the guideline's 'plain language of course controls.'" *United States v. Pedragh,* 225 F.3d 240, 245 (2d Cir.2000) (quoting *United States v. Lewis,* 93 F.3d 1075, 1080 (2d Cir.1996)). Accordingly, insofar as our interpretation in *Napoli* of the "more aptly covered" language of Application Note 11 conflicts with the plain meaning of § 2B1.1(c)(3), the language of § 2B1.1(c)(3) controls.

constitute a violation of § 1503, a defendant's conduct must have some "nexus"— *i.e.*, some "relationship in time, causation, or logic"—to a judicial proceeding, so that the false statements have the "natural and probable effect" of interfering with that judicial proceeding. *Id.* at 599, 115 S.Ct. 2357. Moreover, the Court concluded that a defendant must have a specific intent to interfere with an actual judicial proceeding—not just to interfere with a federal investigation. *Id.* Applying this standard, it concluded: "We do not believe that uttering false statements to an investigating agent ... who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503." *Id.* at 600, 115 S.Ct. 2357.

In *United States v. Schwarz*, 283 F.3d 76 (2d Cir.2002), we applied *Aguilar* and held that, in order to violate § 1503, a defendant's false statements must be made "with the specific intent to obstruct the federal grand jury [or another pending judicial proceeding]." *Id.* at 107. Applying this test, we concluded that a defendant " 'lack[ed] knowledge that his actions [were] likely to affect the judicial proceeding,' " and therefore " 'lack[ed] the requisite intent to obstruct' " because he did not know that his statements would be conveyed to a federal grand jury and had not himself been called to testify before the grand jury. *Schwarz*, 283 F.3d at 109 (quoting *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357).

We hold that the indictment in the instant case does not set forth a sufficient nexus between Genao's false statements and a federal judicial proceeding so as to establish a violation of § 1503. The indictment itself makes no mention of any grand jury or other judicial proceeding. Moreover, even if we were able to consider conduct not specifically alleged in the indictment, the Government's argument would fail. Genao agreed to waive his speedy trial rights so that the Government could postpone filing an indictment until after his innocence proffers. Genao was therefore aware at the time he made the relevant false statements that the Government had not yet convened a grand jury to investigate his arrest for money laundering. Indeed, no such grand jury was ever convened. Accordingly, pursuant to *Aguilar* and *Schwarz*, Genao's false statements could not have been made with the specific intent to interfere with a judicial proceeding.

We also agree with the District Court that the conduct set forth in Count Four of the indictment does not establish a violation of 18 U.S.C. § 1512. Section 1512 is entitled: "Tampering with a witness, victim, or an informant." 18 U.S.C. § 1512. Section 1512(b)(3) states:

(b) Whoever knowingly uses intimidation or physical force, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

. . .

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than ten years, or both. 18 U.S.C. § 1512(b)(3).

The Government maintains that Genao violated § 1512(b)(3) by lying to and misleading the FBI agents and United States Attorneys in order to prevent them from communicating his crime to a judge by means of an indictment. The Government supports this contention by noting that, although the statute is expressly directed

at tampering with witnesses, victims, and informants, it actually applies to all conduct directed at "another person," not just conduct directed at witnesses, victims, and informants. In this case, argues the Government, each of the FBI agents and United States Attorneys to whom Genao lied constitutes just such "another person."

But even if § 1512(b)(3) applies to misleading conduct towards someone other than a witness, victim, or informant, the conduct alleged in Count Four of Genao's indictment does not establish a violation of § 1512(b)(3). Nothing in Count Four of the indictment provides an explanation for why Genao lied to the investigators. Because § 1512(b)(3) requires a specific intent to interfere with the communication of information, the indictment does not set forth conduct sufficient to establish a violation of that provision.

The conduct set forth in the count of conviction establishes neither a violation of § 1503 nor a violation of § 1512. Accordingly, the District Court properly declined to invoke the obstruction-of-justice guideline pursuant to the cross-reference provision of § 2B1.1(c)(3).

IV. *Upward Departure Pursuant to Application Note 15 to § 2B1.1*

■ Application Note 15 to § 2B1.1 states:

There may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted.

U.S.S.G. § 2B1.1, n. 15(A) (2001). The Application Note then lists several factors that a court "may consider in determining whether an upward departure is warranted," including whether "[a] primary objective of the offense was an aggravating, non-monetary objective." *Id.*

The District Court initially indicated that it would depart upward pursuant to Application Note 15 to reflect Genao's aggravating, non-monetary objective of preventing his arrest and prosecution. In reaching this conclusion, the Court relied on its findings that Genao "intended to mislead the government ... in an effort to avoid being prosecuted for money laundering" and that "defendant's lie led to the improper termination of the criminal investigation."

However, the Court subsequently withdrew this ruling because it concluded that Application Note 15 was inapplicable as a matter of law. It explained that, insofar as it could not depart pursuant to the cross-reference provision of § 2B1.1(c)(3), Application Note 15 to § 2B1.1 could not be used "as a back door to allowing an upward departure" that was otherwise prohibited.

■ We disagree. A sentencing court may look to both the sub-sections and the application notes of an applicable guideline in order to determine whether an upward departure is warranted. A sentencing court's determination that it cannot, as a matter of law, depart pursuant to § 2B1.1(c)(3) does not render Application Note 15 a "backdoor" to that impermissible departure. To the contrary, the essential purpose of Application Note 15 is to *permit* a sentencing court to depart where other provisions of § 2B1.1 do not.

In this case, the District Court found that, in providing false statements to the federal investigators, Genao had "an aggravating, non-monetary objective" to thwart his prosecution for participating in the money laundering conspiracy. Accordingly, if the District Court believed that Genao's principal sentence of six months imprisonment did not reflect the seriousness of his offense, it had discretion to depart upward pursuant to Application Note 15.

■ Where a District Court mistakenly believes that it lacks the authority to exer-

cise discretion, we remand for resentencing. *See United States v. Ventrilla*, 233 F.3d 166, 169 (2d Cir.2000); *United States v. Thorpe*, 191 F.3d 339, 342–43 (2d Cir. 1999) (collecting cases). Because the District Court misapprehended its legal authority to exercise its discretion to depart upward in the instant case, we will remand the cause to the District Court for resentencing. Upon consideration of the record or after such further proceedings as it deems appropriate, the District Court may exercise its discretion *vel non* to depart upward pursuant to Application Note 15 to § 2B1.1.

### CONCLUSION

For the reasons set forth above, the judgment of the District Court is affirmed insofar as the District Court declined to depart pursuant to the cross-reference provision in § 2B1.1(c)(3) and vacated insofar as the District Court misapprehended its authority to exercise its discretion to depart upward pursuant to Application Note 15 to § 2B1.1. We remand for resentencing consistent with this opinion.